CHASEZ, Judge.
Martin McNutt, Jr., filed suit against H. B. Hughes Construction Co., and Travelers Insurance Company to recover workmen’s compensation benefits for permanent total disability. Defendants admitted that plaintiff had suffered an accident but averred that his injuries were completely cured 19 weeks after the accident, and that after that time plaintiff was able to return to the identical duties of his former occupation. Plaintiff was paid maximum compensation during those 19 weeks.
*316 From a judgment rejecting plaintiff’s demands on the merits, plaintiff brings this appeal.
The injury plaintiff suffered was the result of a mishap while he was cutting brush with an axe on February 1, 1961; the handle of the axe twisted in his hands with some force when the axe struck some unexpected wood or other hard substance. Fie continued at his work until February 4, 1961, when he was referred to physicians because of swelling in his lower left arm and wrist.
Thereafter for 19 weeks he was treated for teno-synovitis, the treatment being for the most part physical therapy supplied by a therapist in Texas, where plaintiff’s family resides.
After his discharge by the Texas doctor to whom the company doctors in New Orleans had recommended him, plaintiff again attempted employment similar in character to that in which he was engaged when the accident occurred. His testimony is that he was unable to exert force with his left hand in certain positions, because of pain and a reflex action which caused his hand to open and his grip to relax.
He thereafter placed himself in the care of Dr. Nick J. Accardo, an orthopedic surgeon, whose testimony in this case is that plaintiff presented a residual disability involving approximately 25% loss of function of his left wrist, in his opinion due to pre-existing osteoid osteoma having been exposed, by traumatic fragmentation of the cortex covering the osteoma, resulting in the pain and reflex reaction upon certain movements and pressures of the bones of the wrist. This condition cannot reasonably be expected to be remedied, not even by surgery.
The District Court noted the irreconcilability of the expert testimony in reference to the several X-ray pictures which showed some abnormality, described by Dr. Accardo as aforesaid and by defendant’s experts as a pseudo-cyst of no significance. The court below considered the testimony of Dr. Meyer D. Teitelbaum, an expert radiologist, as being entitled to greater weight than that of the other experts on the interpretation: of the X-rays. The District Court thus-adopted the view that the abnormality' shown was a pseudo-cyst, which the experts, testified does not cause pain or is not knowni to cause pain.
We agree, of course, that the opinion of an expert radiologist ought to be-accorded greater weight on the question of X-ray interpretation than the opinion of orthopedic surgeons. However, we cannot reconcile the judgment of the District Court-dismissing plaintiff’s suit with the other-evidence in the record. Plaintiff was injured and disabled; his testimony that he has pain and a reflex loss of power in his-hand upon certain movements is not contradicted by any direct evidence, although' one of defendant’s expert orthopedic surgeons, Dr. Russell C. Grunsten, testified that the softness of muscle in those movements; could be attributed either to “a weakness; in the muscles, a defect in the muscular nerve supplied to it, or a voluntary restriction on the part of the patient, and I cannot distinguish between these two things”; and' Dr. Grunsten also testified “although under-situations of farced extension, even with-passive stress against the thumb, there is; noted some reflex action of the outcropping, musculature.”
Our overall view of the record persuades us that plaintiff’s injury of February-1, 1961, has left him with a residual disability which prevents him from engaging-in employment similar to that he enjoyed at the time of the injury, and that the disability is permanent.
The evidence shows that the plaintiff is; a heavy duty equipment operator in the construction business. However he worked' for the defendant as a common laborer.
Plaintiff’s version of his employment and' the manner in which he was injured appears, in his testimony as follows:
“A. They told me they could give me a job as a heavy-equipment opera *317 tor, they had a man who was leaving their employment and would create a vacancy for me, and if I wanted to work on the crew in the meantime and pick up expenses, that was all right, so I took it.
“Q. What were your wages?
“A. A dollar an hour, but we were working on that particular kind of work, we were getting paid for 12, 14, sometimes IS hours a day.
“Q. How many days a week?
“A. Seven days a week.
“Q. So, your actual salary at the end of the two weeks was approximately what?
“A. I don’t recall the exact amount that I received. I did work each of those weeks in excess of 80 hours.
“Q. Well, it was well in excess of $60.00?
“A. Yes, sir.
“Q. Give us the circumstances surrounding that, would you please?
“A. We were clearing a right-of-way on a well location for Shell Oil Company, and I was having to clear brush with an axe. In chopping these limbs off the trees and things out of the way, the axe twisted in my hand and before I could release the darned thing, it had twisted my arm so bad for an hour or two, actually, I couldn’t use it, and then it seemed to get all right and I went on and worked the balance of the week.
“However, the foreman or pusher, as they call him, did realize that I had a bad arm. I had told him about it, and he managed to see he assigned me to work that I could handle with the sore arm.
Approximately when did that happen, what day of the week? a
Tuesday or Wednesday, the early part of the week.
Did your arm improve or get better ? Ol
It hurt me; it bothered me all along until Saturday, and shortly after our lunch period on Saturday, I noticed that my hand and everything was tingling kind of like it was asleep or something, and I pulled my work glove off, and my hand was swollen and my hand and arm was almost double its normal size, and I showed it to them and they took me to the doctor.
What doctor was that? ¡O
I think his name was Calhoun. He was in this little town just below Buras. >
Empire ? ¡o
Below Empire. >
What did he do? <o
He X-rayed my arm and checked to see if it was broken, because at the time, he thought possibly it was on account of the swelling, and since I had to come back up here to receive my treatment and everything, he just tied it in a splint and put it in a sling, and told me to come to a doctor in Gretna. >
This was on Saturday? lO
Yes, sir. >
When did you see the next doctor? p
On Monday. >
What doctor was that? p
Dr. Logan. >
You were taken to Dr. Logan by the foreman ? p
*318 "A. The company sent me to him; they told me he was their company doctor.
“Q. How long did Dr. Logan treat you?
“A. I don’t want to say this positively, but it was in the neighborhood of a couple of months or a little better than that, about two and a half months, roughly.
“Q. What type of treatment did he give you ?
■“A. Well, first he gave me a shot, some kind of hormone shot that he thought would relieve it, and gave me ultra-sound treatment, and when that didn’t do any good, he put it in a cast. He kept it in a cast for three weeks, I believe, the first time, the first time. He took it out and put it in a half cast, and wrapped it, and they would take it out three times that week, and they gave me three treatments with the sound machine, and they put it back in the cast.
“Q. He put it in that cast several times ?
“A. So many times, to tell the truth, I can’t remember exactly how long each time, but they had it in and out of the cast several times, and finally, he wasn’t satisfied with the progress at all, and he sent me over to see a Dr. Soboloff, and Dr. Soboloff looked at my arm and talked to me, and wrote Dr. Logan a letter, telling him he thought he was giving me the right treatment.
“That’s about all the examination amounted to.”
The defendants produced medical evidence only in this matter.
In addition to his own evidence the plaintiff presented the evidence of Dr. Nick Accardo, an orthopedist. Dr. Accardo testified that plaintiff’s complaints of pain are justified and that plaintiff would always experience pain in his left hand, arm and wrist when engaged in any type of manual labor which requires considerable effort.
Accordingly the judgment appealed from is reversed, and judgment is hereby rendered in favor of plaintiff, Martin McNutt, Jr., and against defendants,- H. B. Hughes Construction Co., and The Travelers Insurance Company, in solido, for workmen’s compensation benefits in the amount of $35.00 per week for a period of not exceeding 400 weeks beginning February 4, 1961, subject to credit for 19 weeks compensation already paid, with interest at 5% per annum on all past payments; and for medical expenses not to exceed $2500.00 and the expert fee of Dr. Nick J. Accardo which is fixed at $150.00.
It is further ordered that defendants shall pay all costs.
Reversed and rendered.